UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOCAL UNION NO. 456, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO and LOCAL 456 IBEW EMPLOYEE BENEFIT FUNDS,<br><br>    Plaintiffs,<br><br>v.<br><br>ELECTRICAL DYNAMICS, INC.,<br><br>    Defendant. | Civ. No. 19-16433 (KM) (ESK)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

    In 1998, Electrical Dynamics, a construction contractor, assigned its collective labor bargaining rights to a third party. The third party negotiated with the local chapter of the International Brotherhood of Electrical Workers and the two sides agreed to contractual terms. The agreement required, among other things, that Electrical Dynamics make benefits contributions to the union on behalf of the company's union employees. Unusually, a single person, Paul McEvoy, is both the owner of Electrical Dynamics and its sole employee; the responsibility, then, was for him to arrange that contributions be made for his own benefits. At some point, the actual benefits contributions paid by Electrical Dynamics fell short of the amount due under the agreement.

    For several years, no one noticed the discrepancy, but in 2019 an external audit revealed a $259,678 deficiency in the amount that Electrical Dynamics should have paid. The union submitted the matter to arbitration, and the arbitrator awarded the union the value of the deficiency, plus fees and costs. The parties dispute whether the arbitrator was contractually empowered to enter that award and whether proper notice of the hearing was given.

Now before the Court is the motion to confirm the arbitration award of Local Union No. 456, International Brotherhood of Electrical Workers, AFL-CIO and Local 456 IBEW Employee Benefit Funds. (DE 2).[1] Also before the Court is Electrical Dynamics's cross-motion to vacate the award. (DE 7). I note that various of the challenges to validity of the award would pose triable issues of fact. There is a more foundational issue, however: Neither the collective bargaining agreement nor the declaration of trust provides that such disputes shall be submitted to arbitration. That issue can be resolved from the face of the agreements. For the following reasons, the motion to confirm the arbitration award is **DENIED**. The cross-motion to vacate the award is **GRANTED**.

I. **BACKGROUND**

　A. **The Parties**

Plaintiff Local Union No. 456, International Brotherhood of Electrical Workers, AFL-CIO ("the union") is a labor union, and plaintiff Local 456 IBEW Employee Benefit Funds ("the Funds") is a series of trust funds that, on the union's behalf, administers members' benefits (collectively, "the IBEW").

Defendant Electrical Dynamics, Inc. is a contracting company engaged in union electrical work. Non-defendant Paul McEvoy has owned Electrical Dynamics since 1998. Since April 2012, he has been the sole employee of Electrical Dynamics. McEvoy has also been member of the IBEW since 1984.

　B. **Facts**

On July 7, 1998, Electrical Dynamics, though McEvoy, executed a letter of assent with the IBEW. The letter authorized the New Brunswick Division of the Northern New Jersey Chapter of the National Electrical Contractors Association, Inc. ("New Brunswick Division") to represent Electrical Dynamics in matters pertaining to collective bargaining with the union:

> In signing this letter of assent, the undersigned firm does hereby authorize <u>New Brunswick Division, Northern New Jersey Chapter,</u>

---

[1]　"DE __" refers to the docket entries in this case.

2

> N.E.C.A. as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved Inside labor agreement between the New Brunswick Division, Northern New Jersey Chapter, N.E.C.A. and Local Union 456 IBEW. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 7th day of July, 1998. It shall remain in effect until terminated by the undersigned employer giving written notice to the New Brunswick Division, Northern New Jersey Chapter, N.E.C.A. and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

(DE 7-1 Ex. 1). The letter is signed by McEvoy and Joseph Egan, the union's business manager. (DE 7-1 Ex. 1). One such "subsequent approved labor agreement" is the collective bargaining agreement.

The collective bargaining agreement ("CBA") at issue here, dated June 1, 2003, was executed by the New Brunswick Division and the IBEW. (DE 1 Ex. A). The 2003 CBA, establishes, in relevant part:

- Minimum hourly wage rates for CBA-covered work, which increase annually. For [] "Journeyman Wireman"[2] work . . . the CBA describes an increase in the minimum hourly wage from $37.20, in 2003, to $45.36 in 2006. [(DE 1 Ex. A at 8)].

- Benefit rates, which are assessed at percentages, set in the CBA, against gross wages paid for CBA work (i.e. "Gross Labor Payroll"). Thus, as wage rates increase annually, so do the Employer's benefit contributions. [(DE 1 Ex. A at 9)].

---

[2] According to the IBEW, the policy of using the journeyman wireman rate for owner/operators is "a compromise between the owner and the Funds. It reflects the reality that benefit rates assessed against an owner's likely higher "Gross Wages" . . . could overcharge the owner for coverage. Thus[,] the journeyman rate is used rather than the owner's W-2 wages. In exchange, the Funds assess an owner's work at a 2,000-hour minimum in order to prevent an owner from reporting the bare minimum hours to receive benefits like health coverage." (DE 13 at 6 (citing DE 13-1 ¶¶ 12 & 13; DE 13-7 at 11).

- Descriptions of the various fringe benefit funds to which CBA Employers must contribute. With respect to the Pension Fund [(DE 1 Ex. A at 22)]; the Welfare Fund [(DE 1 Ex. A at 23)]; and the Annuity Fund [(DE 1 Ex. A at 23)] the CBA states that these Funds shall be administered according to the relevant *Declarations of Trust*.

- Fringe benefit contributions not paid by the due date (15 days following the month in which the work was performed) are subject to interest charges of 1.5 percent per month, from the date when the benefits were due. [(DE 1 Ex. A at 24, Art. 7.10)].

(DE 13 at 2–3) (emphasis added).

The relevant declaration of trust is dated some five months later, on November 25, 2003. It provides in relevant part:

- The Trustees [may] "initiate on behalf of the Funds such lawsuits and. . . arbitration proceedings as the Trustees deem necessary or appropriate . . . ." [(DE 1 Ex. C at 13; DE 13-1, 13-2 & 13-3)]. . . .

- Contribution rates for the various Funds "shall at all times be governed by the Collective Bargaining Agreement or other Fund-approved agreement then in force and effect, together with any amendments, supplements or modifications thereto." [(DE 1 Ex. C at 24)]. . . .

- On an Employer's default in payment of its Fund contributions, the Trustees may assess interest at 1.5 percent per month, and may require a defaulting employer to pay liquidated damages at 20 percent of the delinquency and may assess the defaulting Employer for expenses, including attorneys' fees and arbitration fees. [(DE 1 Ex. C at 25)]. . . .

- With respect to audit rights, "[e]ach employer shall submit to the Fund all reports and documents as the Trustees deem necessary or appropriate to collect or verify contributions." [(DE 1 Ex. C at 26)].

- The Trust Agreements may be amended by joint execution by Union and Employer trustees. [(DE Ex. C at 31)]. . . .

(DE 13 at 3–4). The declaration of trust binds the union and the Middlesex Division of the New Jersey Chapter, Inc. National Electrical Contractors Association ("Middlesex Division"). (DE 7-1 Ex. 6 at 5).

McEvoy, on behalf of Electrical Dynamics, maintains that he never saw this declaration of trust and was not notified of its existence.

On June 20, 2018, the accounting firm Moore Stephens P.C. contacted the Funds, indicating that it had been directed to conduct a "for cause" audit of Electrical Dynamics's contributions. Electrical Dynamics, it said, had not responded to its audit demand. (DE 13-6).

Moore Stephens conducted its audit using the documents available. These documents reflected the data reported by Electrical Dynamics pursuant to the CBA: hours worked, wage rates, and benefits paid. The audit covered the period from January 1, 2014 to January 31, 2019. Moore Stephens's audit found that Electrical Dynamics was $259,678.41 behind in its benefits contributions. (DE 7-1 Ex. 3). According to the audit, the deficiency resulted from McEvoy's underpayments (wearing his hat as owner of Electrical Dynamics) based on work he performed (wearing his hat as employee/union member).

### C. Procedural History

On March 13, 2019, Bradley Parsons, counsel to the union and the Funds, emailed McEvoy, informing him of the audit and its findings. Parsons's letter stated that "[a]bsent payment of the above-captioned amounts by March 19, 2019, this matter will be submitted to arbitration on ***Tuesday, March 26, 2019*** at ***11:00 a.m.*** in this office for resolution before the Funds' permanent arbitrator, J.J. Pierson, Esq." (DE 7-1 Ex. 3). Parsons asked McEvoy to "contact [him] to discuss resolution." (DE 7-1 Ex. 4).

Attached to Parsons's March 13 letter as an exhibit was another letter, dated April 27, 2018, from Moore Stephens to Electrical Dynamics. This second letter explained the audit and requested the company's payroll and time

records. (DE 7-1 Ex. 3). Electrical Dynamics maintains that it never received that April 27, 2018 letter from Moore Stephens.

The parties were also in email communication. On March 13, 2019, Parsons emailed McEvoy stating that "The arbitration is [*sic*] Please contact me to discuss resolution." On March 15, 2019, Parsons emailed McEvoy saying, "per our conversation, the arbitrator is cc'd on this e-mail" (possibly a reference to the March 13 email, which appears in the string). (DE 13-10). It is unclear what the intervening "conversation" consisted of. [3]

On March 25, 2019, McEvoy again emailed Parsons. McEvoy's email presented Electrical Dynamics's view of the issue and offered to monetarily settle the dispute. McEvoy explained that he was unaware of how and when the accounting error occurred and that the financial liability he now faced would be ruinous for him:

> I have reviewed the information that you sent. Needless to say it comes at a bit of a surprise.
>
> First. I would like to apologies for the mistake on our part that started this issue. In speaking with Rita in the office who handles the submissions, we seemed to have had a gross miscommunication. One that started some time ago that was set on auto pilot. This is why it lasted as long as it did on our end.
>
> Second. I don't understand how this was missed by I.E. Shaffer for all these years. Any time we are either short or over by pennies, . . . we are contacted by letter that shows a difference and we make up for it on the next submission. This, however should have been red flagged years ago. Granted, we made the initial mistake but this is gross incompetence. I can't comprehend how they can catch minor discrepancies and overlook a major error as this. And for that, they are complicit. Where are the checks and balances ? Their primary function is to be validating all of the information we submit on a monthly basis, Including, and what should be the most important piece of data on the submission, is the rate of pay.

---

[3] In its brief, IBEW says that "counsel advised McEvoy that counsel had no authority from the Funds to consent to adjournment of the hearing and that any adjournment request must be made to the arbitrator." (DE 13 at 7). The content of this conversation may also present an issue of fact.

6

> I should have been notified the day that rate changed one penny when ours didn't match. This would have been especially true if I had staffed electricians on payroll and would have absolutely never have happened. Why would this be any different? I would happily paid it as have always done.
>
> I.E. Shaffer is as well responsible for this current condition. The burden should not be left completely upon my shoulders.
>
> For my entire business/working career, I have responsibly paid the benefits without fail for not only myself but the many employees I've had over a number of years. Not only in 456 territory but others as well.
>
> I am now however presented with a dept that is a fairly insurmountable amount given my small stature as a contractor. For the past six or so years I am chief cook and bottle washer. The sun is setting on my career. The way I see it, I have another couple good years left in me. The business has worn me out past my age. It would be best to get this over with at once. I want to and would have paid the entire amount had it been and should have been caught sooner but at this point it's simply not achievable. I have never, in my entire life, not paid my bills or carried any debt and its making me sick not to be able to do so.
>
> Again, I can't and won't take the entire blame for this situation. The responsibility should and must be shared. We wouldn't have come this far without complete and utter failure of Shaffer to validate the submissions.
>
> I am in the position to pay 45,000.00 and get this over with now and move on with the corrected payments. This is a fair proportion to the degree of culpability between myself and Shaffer. And I can continue in business.

(DE 7-1 Ex. 4 at 2–3).

Meanwhile, on March 26, 2019, the union held an arbitration hearing before J.J. Pierson.[4] (DE 7-1 Ex. 5). McEvoy and Electrical Dynamics were neither present nor represented at the hearing.

---

[4] On July 10, 2007, the IBEW and the employer trustees of the Funds appointed Pierson as the permanent arbitrator of collection controversies. (DE 13-5).

7

On March 27, March 29, and May 21, McEvoy again followed up with Parsons on the same email thread, again offering to settle the dispute. (DE 7-1 Ex. 4). From the context, McEvoy does not seem to be aware that the hearing has occurred. Parsons did not respond to either McEvoy's original March 25 pre-hearing email or to his follow-up emails of March 27, March 29, and May 21. (DE 7-1 Ex. 4).

On May 28, 2019, Pierson issued an award in which he found Electrical Dynamics liable for $312,514.09, which represented the delinquent benefits contributions, penalties, and costs. (DE 7-1 Ex. 5). Pierson did not make very specific finding as to the basis for finding the claims to be arbitrable. Pierson did find "that Electrical Dynamics Inc., the Employer, is bound to a Collective Bargaining Agreement ("Agreement") with Local 456, I.B.E.W. (See Funds Exhibit, U-1)."

On June 1, 2019, Electrical Dynamics received a mailed copy of Pierson's award and order. On June 17, 2019, McEvoy wrote the IBEW plan administrator, seeking copies of:

- Documents governing the Plans' operation;
- The Plans' latest annual report . . .;
- An updated Summary Plan Description . . .;
- The most recent statement of [his] accrued benefits . . .; and
- A history of [his] accrued benefits, under any, or all of the Plans.

(DE 7-1 Ex. 7). McEvoy maintains that he had never seen a copy of the declaration of trust until one was furnished to him in response to this request.

On August 7, 2019, the IBEW petitioned this court to confirm the arbitration award. (DE 2). On August 30, Electrical Dynamics moved to vacate the award. (DE 7).

## II. DISCUSSION

### A. Standard of Review

The Federal Arbitration Act evinces a strong presumption in favor of enforcing arbitration awards. *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005). Section 9 of the FAA states, in relevant part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. In short, unless the arbitration award is vacated pursuant to § 10 or modified or corrected under § 11 of the FAA, the award "must" be confirmed.

Arbitration is proverbially a creature of contract. It is of course a prerequisite to confirmation of an award that the parties have agreed to arbitrate. Where "parties insert[] an extremely capacious arbitration clause into [an] Agreement [that] provide[s] that 'all grievances and disputes [over the application or interpretation of [the] Agreement" shall be arbitrated, courts have held that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 399 (3d Cir. 1994) (quoting *AT&T Technologies, Inc. v. Comm'ns Workers*, 475 U.S. 643, 650 (1986)); *see also Flintkote Co. v. Textile Workers Union*, 243 F. Supp. 205, 210 (D.N.J. 1965) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a

purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad.").

Assuming the matter was arbitrable in the first place, "[t]he Supreme Court has held that 'the courts play only a limited role when asked to review the decision of an arbitrator.'" *Wilkes Barre Hosp. Co. v. Wyo. Valley Nurses Ass'n PASNAP*, 453 Fed. App'x 258, 260 (3d Cir. 2011) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract . . . . As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco*, 484 U.S. at 36 (quoting *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). This is because " arbitration is a matter of contract," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960), so if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (quoting *Misco*, 484 U.S. at 38). "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem." *Enter. Wheel & Car*, 363 U.S. at 597.

These standards give a district court little leeway in reviewing an arbitration award associated with a collective bargaining agreement. *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) ("District courts have very little authority to upset arbitrator's awards."). If the award "draws its essence" from that agreement, the court must confirm it. *Brentwood Med. Assocs.*, 396 F.3d 237 at 240 (citation and internal quotation marks omitted). "An arbitrator's award draws its essence from a

collective bargaining agreement if its interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Id.* at 241 (emphasis in original) (internal citation omitted); *see also News Am. Publ'ns, Inc. Daily Racing Form Div. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990) (A court "may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract," but must enforce the award so long as "the arbitrator has arguably construed or applied the contract, regardless of [whether] . . . a court is convinced that [the] arbitrator has committed a serious error." (emphasis in original)).

Section 10(a) of the FAA provides the grounds upon which a district court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. Further, an arbitration "award is presumed valid unless it is affirmatively shown to be otherwise . . . ." *Brentwood Med. Assocs.*, 396 F.3d at 241.

FAA review of an arbitration award may pose factual questions: Did the parties agree to arbitrate? Was a party given proper notice of an arbitration hearing? In such a case, the court is to apply the familiar standards governing summary judgment under Fed. R. Civ. P. 56(c). *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 159 n.3 (3d Cir. 2009) ("The standard for

determining whether a genuine issue of material fact exists regarding the existence of an agreement to arbitrate is 'quickly recognized as the standard used by district courts in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c).'") (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980). Thus, the court is to look for the existence of a genuine, material issue of fact. *See* Fed. R. Civ. P. 56(c). If such issues of fact remain in dispute, they must be tried:

> Section 4 provides that a district court must enter an order to arbitrate 'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue.' If either of these points is in issue, § 4 provides that 'the court shall proceed summarily' to a trial on that point.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 n.27 (1983) (quoting 9 U.S.C. § 4). Where, as here, there are cross-motions for summary judgment, the Rule 56 standard will be applied separately to each; denial of one does not imply that the other must be granted. *See Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 862 F.2d 214, 216 (3d Cir. 1987)).

### B. Analysis

Electrical Dynamics moves to vacate the award, arguing that:

- the parties did not agree to arbitrate the dispute;
- the CBA did not authorize the underlying arbitration;
- Electrical Dynamics was not placed on notice of the underlying arbitration; and
- even assuming that the arbitration was appropriate, the award does not draw its essence from the CBA because the arbitrator crafted a decision that conflicts with its express terms and adds terms to the CBA.

(DE 7-1 at 6).

The IBEW, in turn, argues that

- the CBA contractually obligated Electrical Dynamics to contribute to the Funds;

12

- Electrical Dynamics significantly underpaid its Fund contributions during the audit period;
- Electrical Dynamics was contractually obligated to submit to the audit and to arbitrate disputes arising from its findings; and
- the audit results and arbitration award arise from Electrical Dynamics's failure to satisfy its contractual obligations.

(DE 13 at 1).

Before the arbitrator was the CBA, a so-called "Special Report" prepared by Moore Stephens (*i.e.*, an audit of unpaid contributions), and (possibly) the declaration of trust.[5] (DE 1 Ex. D at 1–2). Before this Court, the IBEW has sought to expand that record significantly.

In addition to the evidence presented to the arbitrator, the IBEW now submits the declaration of trust of the annuity fund, the declaration of trust of the welfare fund, the declaration of trust of the supplemental welfare fund, the 2007 letter appointing Pierson "as the permanent arbitrator to the Funds," the 2018 audit-demand letter from Moore Stephens, Parsons's 2019 letter to McEvoy, the eligibility rules for welfare funds, the union's wage sheets, and a 2019 email chain from Parsons to McEvoy. (DE 13-2 to -10). None of these documents were in evidence at the arbitration.

1. **The Collective Bargaining Agreement**

The arbitrator's award cites the CBA, but is not specific about the basis for the claims being arbitrable. The CBA, the operative agreement during the audit period, is dated June 2003.

The CBA does not contain an arbitration clause. Moreover, it specifies an entirely different dispute-resolution process:

---

[5] The award contains the allegation that "[p]ursuant to Article VII (<u>Benefits</u>) of the Agreement the Declaration of Trust (see "Trust Agreements") [*sic*] [(DE 7-1 at 64)]." "Article VII" is a probable reference to the CBA. (*See* DE 7-1 at 33) Various paragraphs in Article VII of the CBA *refer* to the various trusts and the fact that they would be administered under a declaration of trust. Whether this means that the arbitrator inspected or was interpreting the declaration of trust is difficult to discern.

> 1.6 All grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.
>
> . . .
>
> 1.8 Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding on both parties hereto.
>
> 1.9 When any matter in dispute has been referred to conciliation or arbitration[6] for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

(DE 1 Ex. A at 2).

The CBA also provides for more limited penalties than those imposed by the arbitrator here, namely removal of union members who are employed by the delinquent employer and termination of the agreement:

> 7.10 Employers doing work in the jurisdiction of Local Union No. 456 and failing to pay required . . . contributions monthly to the IBEW Local 456 Distribution Fund . . . shall be subject to having this Agreement terminated upon seventy-two (72) consecutive hours['] notice in writing being served by this Union, provided the Employer fails to show satisfactory proof that delinquent payments have been paid to the respective funds. . . .
>
> In the event that contributions are not received on the required date, the Board of Trustees or the administrator of the fund shall have the authority to assess a delinquent penalty of one and one-half percent (1 1/2%) per month interest from the day upon which

---

[6] This passing reference is the sole mention of arbitration within the CBA. This would not rise to the level of a reasonably specific arbitration clause. *See* pages 9–10, *supra,* and authorities cited.

> contributions are due, which said interest shall be considered delinquency charges. . . .
>
> In the event that a matter is forwarded to counsel for the respective Fund for collection purposes, an Employer, found to be delinquent, shall be required to pay the interest set forth plus all attorney's fees and court costs incurred by the Trustees to enforce such payments as stipulated damages.
>
> 7.11 If an Employer becomes two consecutive months in arrears (60 days) in making the required contributions to the respective Trust Funds as required under this Agreement, the Employer may then be required by the respective Trustees to make said future contributions on a weekly basis for a period of two months.

(DE 1 at 24–25).

The arbitrator's award and order cites the same CBA sections, but these sections on their face do not bestow any powers on an arbitrator:

> Article 7.10-7.12 (Collection Procedure) describes procedures established by the Trustees of the Funds to address those employers who are delinquent in remitting contributions to the Funds. As established through the procedures, when delinquent in contributions, an Employer may be assessed penalties including, but not limited to, payment of unpaid contributions, interest on the unpaid contributions (determined at the rate of the prime interest rate), reasonable attorneys' fees and costs of the action, and other such legal or equitable relief as the Trustees deem appropriate.

(DE 1 Ex. D at 1). The CBA does not vest in the arbitrator the power to grant "other such legal or equitable relief"; indeed, the CBA does not provide for an arbitrator at all.

Because the CBA contains no arbitration provision and indeed imposes a different dispute-resolution process, the award must be vacated.

### 2. The Declaration of Trust

An alternative potential basis for arbitrability might be the declaration of trust. (As noted above, the award makes no specific finding as to the basis for arbitrability.) The CBA cross-references the declaration of trust, although it was not signed until several months later, in November 2003.

The declaration of trust does contain arbitration language stating that the Trustees [may] "initiate on behalf of the Funds such lawsuits and. . . arbitration proceedings as the Trustees deem necessary or appropriate . . . ." [(DE 1 Ex. C at 13; DE 13-1, 13-2 & 13-3)]. That clause, a generic grant of power to the Trustee, cannot be read as an implied agreement to arbitrate claims against employers for unpaid contributions. It contains none of the usual specific provisions we would expect in an arbitration clause. *See* pages 9–10, *supra*, and authorities cited.

Moreover, this clause has another, obvious meaning. What the declaration of trust *does* contain is an arbitration clause that applies to disputes among the Union and Employer trustees about the administration of the trust. It applies where there is a tie vote, or where a quorum is twice found lacking. As to those kinds of disputes, there is a conventional arbitration clause, specifying how the arbitrator should be selected and so on. (*See* declaration of trust art. VIII, §§ 1 & 2; art. VII, § 5) These drafters knew how to provide for arbitration when that was desired.

The face of the declaration of trust, then, provides no basis for arbitration of claims of this kind.

In addition, and in the alternative, there remains at least an issue of fact as to whether the declaration of trust was agreed to by the parties and conferred upon the arbitrator the power he exercised when he issued the award in favor of the IBEW.

Electrical Dynamics and the union executed the letter of assent that governs their relationship in 1998. That agreement obligates the New Brunswick Division to bargain on behalf of Electrical Dynamics's employees and obligated the company to adhere to the CBA with respect to union benefits. The declaration of trust was executed five years later, in 2003; it did not exist at the time of the letter of assent, and the letter of assent does not even contemplate its existence.

McEvoy states that he never saw a copy of the declaration of trust until he petitioned the Funds for records in June 2019—after the arbitrator issued

16

the order and award.[7] Even assuming that the declaration of trust provided for arbitration, the assent of Electrical Dynamics to the terms of the declaration of trust would present an issue of fact.

### C. Due Notice

There is in addition an issue of notice of the hearing, which would have to be tried if the award were not vacated on other grounds. The arbitrator found that Electrical Dynamics had been afforded due notice (DE 1 Ex. D at 1), but the record suggests that McEvoy was broadsided by the news of the delinquency and poorly positioned to adequately represent himself at the arbitration. According to the evidence now in the record, it was on March 13, 2019, that Electrical Dynamics first learned of (1) the benefits deficiency, (2) the audit, and (3) the impending arbitration.

On that date, Parsons also communicated to McEvoy that the "matter [would] be submitted to arbitration on Tuesday, March 26, 2019 at 11:00 a.m. in this office for resolution before the Funds' permanent arbitrator." (DE 7-1 Ex. 3). He also asked McEvoy to contact him to discuss a resolution. Taken together, these factors may have appeared to McEvoy as a sign that negotiation remained possible. Indeed, McEvoy emailed Parsons a settlement offer and his view of the matter, which acknowledged a degree of responsibility.

The McEvoy-Parsons email exchange further reveals that McEvoy was unaware that the March 26 arbitration was a non-negotiable event. McEvoy's emails to Parsons draw attention to the fact that the genesis of the delinquency appears to have been an accounting error, unnoticed by both sides, that was

---

[7] Furthermore, it is not clear from the record that the declaration of trust *could* bind Electrical Dynamics. The New Brunswick Division and the Middlesex Division are both within the Northern New Jersey Chapter of the National Electrical Contractors Association. The 1998 letter of assent was executed as between Electrical Dynamics and the New Brunswick Division; the declaration of trust, on the other hand, was executed between the company and the Middlesex Division. The parties do not substantially address this discrepancy. There is no evidence in the record sufficient to determine the issue of whether an agreement with one division could bind another. Nor is there any evidence of, say, a merger, acquisition, or name change that would give the declaration of trust legal effect vis-à-vis Electrical Dynamics.

17

never rectified. McEvoy expressed contrition and a willingness to settle the dispute. His entreaties continued in good faith; he again emailed Parsons the day before and after the arbitration (though it appears he did not know that the arbitration hearing had occurred). The record thus reveals that McEvoy was not aware that the "matter will be submitted to arbitration" meant that the arbitration was definitely taking place on March 26, 2019, even if negotiations were occurring. Parsons's near-silence during this timeframe further suggests that the IBEW's position was strengthened by McEvoy's unfamiliarity with the arbitration process.

Setting aside arbitrability and the substance of the arbitration award, I have sufficient doubt as to whether the matter was properly and fairly submitted to the arbitrator for a hearing. Nothing is at stake here except the benefits payments for McEvoy himself. No third-party rights are implicated. McEvoy was at all times cooperative and never indicated that he wished to simply abdicate or ignore the claim. If the matter were tried, I would have to consider whether McEvoy's failure to appear was attributable to the parties' conduct or his excusable misunderstanding of the process.

## III. CONCLUSION

The cross-motion to vacate the arbitration award is **GRANTED**. The motion to confirm the arbitration award is **DENIED**.

A separate order will issue.

Dated: March 27, 2020

/s/ Kevin McNulty

**Hon. Kevin McNulty**
**United States District Judge**